That case is submitted. We'll go to the third and final case, which is Williams v. Board of Regents of the University of Georgia, 23-12-878. I've got Ms. Jeffords here for the appellant, Mr. O'Kelly for the appellee. Ms. Jeffords, whenever you're ready. It looks like you've got three minutes that you've reserved. Very well. Good morning and thank you, Your Honors, for allowing us to be here today. Tanya Jeffords and Kenneth Ratley on behalf of the appellant, Dr. Leslie Williams. Mr. Ratley couldn't be here today due to a family emergency. This case involves Title IX, ADA, discrimination claims, Title IX, ADA, whistleblower retaliation claims, and a breach of contract claim. Due to the limited time today, we would just stand on our briefs, but we want to discuss three things with you today. Can you first address our most recent decision, Joseph, in which our court has held that there is no private right of action for sex discrimination employment cases under Title IX? Yes. In the Joseph case, I think the court was looking at Joseph. Those two plaintiffs in that case were both teachers and they were not actually sexual assault survivors and students. This case is brought under Title IX because it is expressly within what Title IX was designed to prevent, which is discrimination on the basis of sex, which includes discrimination because you are the victim of a sexual assault or you complain about somebody being the victim of a sexual assault. I believe that that case is distinguishable with regard to they did not have a claim because they were employees. They were not students, and Title IX is addressed to students and the basis of sex. To that point, we want to start with our Title IX case that there was evidence of sex discrimination and ask you to reverse the court's finding of granting of summary judgment on all claims due to the fact that they found that the June 4th letter was not any evidence of disparate treatment at all and was, in fact, evidence of the same or similar treatment. And two, we want the court to reverse the finding of the district court on their finding that we did not present similarly situated male residents who had not been victims of sexual assault. And that's really where this case begins. And two, if this Court were to agree with our assessment that under Rule 56, this record creates a reasonable question of fact for a jury to decide as to the illegal motives of the State defendants in this case, then we would go to due process. under not only the substantive due process clause and the procedures that they used. Didn't the district court, in addition to addressing your comparators, didn't the district court say, and also the overall quantum of evidence, could not lead a reasonable jury to conclude that sex discrimination occurred? Yes, Your Honor, and that's where we respectfully disagree and ask this court to find that when you apply Rule 56 in this case, and you look at this from a convincing mosaic situation, what you have is, was the loss of trust that the board said led them to this second sham of a process to terminate her, was it because she engaged in protected activity? Was it because she was a female sexual assault survivor? And what are the things that we have in this record that support a finding of sex discrimination and different treatment? Number one, under the convincing mosaic, one of the things that this Court has looked at is you can provide evidence of a systematic treatment, different treatment, of someone outside the protected class. Our protected class is a sexual assault provider, survivor, and a female. The males that we gave to this Court had engaged in behavior that was even more egregious and in our, we believe a jury could find more egregious and impacted patient safety than what Dr. Williams did that they alleged in the June 4th letter. Most importantly, what the Court did fail to realize and look at is we have A, the tape. Dr. Myler, Dr. Arthur says on that tape, the number one reason that we're here is because you reported us to the ACGME and the GME office. We have all of these residents having the opportunity to get probation and remediation. We have it undisputed that the state in this case violated the House Rule 13.0, which is what all medical residents are reliant upon on when they go in and work for little pay and long hours. Wouldn't you agree that anesthesiology is a critical area for a physician where you have to be on all the time, right? Yes. And in June of 2018, your client fainted in the operating room and then disclosed that she had been consuming alcohol over the weekend and described it as being a bit excessive and then also mentioned some substance abuse over the weekend, right? Yes. And then so following that, the doctors wanted her to take a drug test and she blamed her fainting on alcohol use coupled with medication. And then she recorded the meeting with her supervisors and the recording has her saying, this is bullshit, straight up. I'm on a medication that lowers my blood pressure. And then discusses some of her drinking over the weekend. And then she told them that she would take their damn drug test so that when it comes back clean, they could shove it up their ass. Do you disagree that that was an unprofessional response by your client? I do not disagree that it was an unprofessional response, but this is not a case where the court has to invade the province of the academics and their decision in this case because the ad hoc committee decided that this type of behavior that she went through, it actually was something that she should get probation and remediation for. And that is why we have these comparators. All of the different males who were not sexual assault victims engaged in behavior and they got probation and remediation. This is a disparate discipline case, so you're necessarily going to have something that the person did wrong. But if you take each of those individual factors and you apply a but-for standard, the question really becomes, but for her having engaged in protected activity, but for her having been the victim of a sexual assault and they thought that she had a perceived disability that did not allow her to do her job, but for each of those reasons, would she have just like those male anesthesiology residents been placed on probation and remediation? This court does not have to invade that province because the ad hoc committee decided it, Dean Hess upheld it, and she was reinstated. But didn't we in Lewis say that ordinarily the comparators are going to be, you know, have a similar misconduct, similar discipline history, same or similar supervisors? We don't really have very close matches here, do we? I believe we do, Your Honor, because they are all in the anesthesiology department. We deliberately selected those two. They are all subject to the same supervisors, Dr. Arthur and Dr. Myler. They all engaged in what they claimed to be those same or similar conducts, which would be lying, not showing up for call, and unprofessional behavior. One of our comparators actually was, his behavior was such to the point that he was overdosing patients, and they actually said in that case that the surgeons did not want to work with him. And so if we have, a jury could certainly find systematic better treatment of the males than the females in this case. And they were all placed on multiple probations and remediation. Dr. Kelly, Dr. Williams had never been placed on probation. The only warning she got was after her lawyer sent a letter on November 18th saying that she felt like she was being discriminated against because she was a victim of sexual assault, and because she was a female, and she was being made to jump through many hoops that the males were not. That is when she first came back and got a warning for that cussing that she did. That also creates for the due process issue, cussing is a conduct. So if you say, but for the cussing, would she have been terminated? No. I think the logical answer to that would be no. At the most, it would be unprofessional behavior that would warrant remediation. And then let's look at House Rule 13.0, which we really need to stand on in this case. But didn't, before you move on, didn't Dr. R end up choosing to resign from his residency? So I don't think you can say that he wasn't terminated since he chose to resign. He chose to resign. However, you have to look in the record that we've supplied where we say you show that he was put on multiple opportunities for probation and remediation. Our client never got that. And when the ad hoc committee decided that in response to her behavior that this is a probation remediation, and, in fact, at 130-40, which is where you'll find the ad hoc committee's findings, what they said is it seems that they did not consider probation or remediation. It seems like some of these things are due to miscommunication within the context of the department. The ad hoc committee said that her evaluations seemed to be fine. So, therefore, probation is the appropriate response. And in disparate discipline cases, that's what we have to decide. Are you going above and to the point of termination due to a protected activity and or an illegal factor? And the factors in this case show, when you look at the letter, at the end of that letter, it says, she challenged the goodwill of this department because by filing a claim of sex and disability discrimination. So if you take each of the factors in the July 4th letter and the inconsistencies of how that letter was even sent to them, in their depositions, they said that they never conferred about this decision. Remember that the second decision to terminate her clearly violates House Rule 13.0. If you look at 130 — look at the House Rule 13.0, residents under Federal grants sign a contract. She had a right to rely on the contract. The contract says that she will consider probation, remediation, or dismissal. And if you do have that, you will bring it to the CC Clinical Competency Committee. And after that, if they find against you, you will then have the right to appeal to the ad hoc committee, which she did. They presented that evidence to the ad hoc committee. The ad hoc committee made a recommendation that probation was the appropriate response, not dismissal. Dean has reinstated her. It is the second sham of a process that the defendants created when they came back on June 3rd. That is another piece of evidence that shows that her sex, her disability, and her protected activity motivated their — motivated them to take the action to send this letter to their CEO and have him terminate her privilege, so therefore they could overturn the ad hoc committee's decision. You've referred twice to the second sham of a process. Do you mean the faculty meeting? Is that what you're talking about? If you look at the whole process, they called that faculty meeting on June 3rd. If you look at the notes from that faculty meeting, they have — why are they, number one, submitting to the entire faculty that she engaged in protected activity? They talk about threats to — what about her threats to sue? What about her PTSD? And Dean Hess, in that meeting, also says there's no right to appeal. What they realize is that, pursuant to House Rule 13.0, the contract she signed to work for them as a resident, she had the right to appeal it to the ad hoc committee. The dean has had the right to either affirm that decision or not affirm that decision. And that's the difference on all the cases that you've had before you in the residency cases. You won't find a case where the resident actually won and the academic said probation and not termination is the actual response. She won that. So the second process they did was they had a plan B, and it's in the text messages that we received during summary judgment. When they said in their deposition, we didn't confer about this. We didn't find text messages, well, we need a plan B. She cannot appeal from Dr. Kuhl's decision.  So that's the scam. So we've let you go over a little bit, but you've still got your rebuttal time remaining. Bear with me. Mr. O'Kelly, let's hear from you. Everyone is sympathetic with Dr. Williams' situation, but patient safety is absolutely paramount. Williams made a mistake that nearly killed a patient. She fainted in the operating room after substance abuse. She abandoned her call, which is a very serious patient safety issue. She cheated on an exam, and she cussed out her supervisors. Those are the reasons, among others, that she lost her privileges and was ultimately terminated. It was not because of her sex. It was not because of a disability, and it was not because of any protected conduct. What's your position as to why the comparators don't do enough to get her where she needs to be in the success of her claim? Again, you have people who were intoxicated. I think one person actually got a felony conviction. You have another person who over-medicated, I think, patients. Definitely egregious behavior as well. I think you could say that some of them had bad behavior, but the question isn't just did some other comparator have some other bad behavior. It's whether they had the same basic similar misconduct, and none of the comparators here had the same basic misconduct, especially when you look at it in the aggregate. So, for example, neither Dr. A.T. nor Dr. R. were caught cheating, and Dr. A.T., for example, he did not abandon call. Well, Lewis, I think, says, I believe Judge Newsom just said, it doesn't have to be apple to apple. It just has to be similar enough. That's right, Your Honor. It doesn't have to be identical. It doesn't have to be a doppelganger, but it still has to be the same basic misconduct, and I think here the differences are very qualitative. It's not just saying this is a minor apples to apples difference. It's that it's a very substantial and qualitative difference, and even as to some of the comparators, so Dr. R., for example, while we dispute that he is a proper comparator, even if he were, that would undermine the discrimination claim because, as Judge Grant pointed out, he resigned, and actually the record shows that they were planning on terminating him. So even if he were a proper comparator, that would show similar treatment, not different treatment, and beyond that there's no other evidence of discrimination based on sex or disability. And then as to the retaliation claim, that claim failed, or those claims failed, and the basic reason they failed was that Dr. Williams cannot satisfy the but-for test. That test asks, if we remove the protected conduct, would Williams still have been terminated? And the answer here is, had Williams not complained, yes, she absolutely still would have been terminated, and the reason we know that is that the evidence is overwhelming that she had engaged in several problematic behaviors, all the things that I had already listed, and some of those things standing alone would have supported termination. So, for example, abandoning call. That's a serious patient safety issue. When you're on call, that means you're the person that they're relying on if there's an emergency. If you're not there, there's probably not any backup, and Dr. Kuhl testified to that fact that it's not just some kind of treatment mistake, it's something that everybody knows is not okay at all, and he testified that's something that, standing on its own, would have probably resulted in him suspending a resident's privileges. So, when you take that, and especially when you take everything together, Dr. Williams can't satisfy the but-for test. Well, the record also shows, you know, after the assault, that the program did make some allowances. Some would say, I guess, the legal term of art is accommodations. It also appears in the record at some point Dr. Williams decided that she no longer needed those accommodations, and that is my struggle in terms of the relationship with the disability and accommodation. If, indeed, at some point she decided she didn't need it, I think that that is very challenging. But if, indeed, the behavior post those accommodations were still related to the disability or the experience, then wasn't it still the program's responsibility to address it in another way, absent complete removal from the program? Sure, Your Honor. I think there's two points there. I'm not sure that Williams has argued that her behavioral problems, for example, in February and in March 2019, I'm not sure that she's argued that those are a consequence of her disability. But I would say that to the extent that they were a consequence of her disability, that would take this out of the ADA context because it would mean she's not a qualified individual. Now, to be sure, the ADA does have a reasonable accommodations requirement, but Williams hasn't argued on appeal that probation would have been a reasonable accommodation. I don't understand that to be her argument. Her ADA argument goes towards the time period before December 2017 about accommodations to return to clinical practice before that. So, and I just want to correct a couple of things that the other side said. First is about this audio recording. Dr. Myler did not say that the number one reason she was terminated is because of the complaint that she filed. He did not say that that's an inaccurate characterization. It's not a quote, and it's an inaccurate paraphrasing. Additionally, nothing in the policy 13 prevented the staff from raising their concerns with Dr. Kuhl, and certainly nothing in that policy prevented Dr. Kuhl from suspending her privileges. So I think that's a little bit of a red herring and is a little bit misleading here. Finally, as to the faculty meeting notes, Williams has presented this meeting as if Drs. Myler and Arthur stood up and said, hey, everyone, just so you know, Dr. Williams has filed a complaint, so let's hear all your problems with her. That's not what the record shows at all. The record shows that there were 27 participants at this meeting, and at the very end of it, two doctors refer to the fact that Williams has threatened to sue them if they give her negative evaluations. And they don't present that at all in a way that suggests any action should be taken against her. They present that only to say, we don't want to get in trouble for doing anything. We need to make sure that we respect the fact that she's hired lawyers. So, again, I don't think that the faculty meetings support a claim of retaliation at all, and I would add that neither of those two doctors are the State defendants in this case. But if there are no remaining questions, I'll yield the balance. I've got a question. What's your response to the suggestion that kind of the overriding of the original decision not to terminate her is itself suspicious? You mean the ad hoc committee? Right. Sure, Your Honor. A couple of things about the ad hoc committee. I don't think it's evidence really of anything in this case. The primary reason is it's not the relevant decision maker. The question isn't whether one committee disagreed with another. It's whether these specific State defendants disagreed with the ad hoc committee. And if they did, that means they didn't have retaliatory intent. And it's obvious that they disagreed. They were the ones presenting the case to the ad hoc committee that Dr. Williams should be terminated. But beyond that, the ad hoc committee's report itself has some serious problems. It basically doesn't contend with these behavioral issues at all. It's really concerned only with the case logs issue. It doesn't address the full scope of problems. And that's why the faculty was so opposed to the ad hoc committee's ultimate recommendation, because they thought that the ad hoc committee got it entirely wrong. Thank you. Okay. Very well. Thank you so much. Ms. Jeffords, you have three minutes of rebuttal time remaining. Yes, Your Honors. With regard to the ad hoc committee and Justice Grant's question, why is that not important in this case and why is that not suspicious? Well, the ad hoc committee, what that gives them the opportunity to do is to present all of the issues that you have with that person and to support a dismissal. And so they have the opportunity to do all of that, which goes back to why the timing is very suspicious in this case. You had all of this opportunity. You presented a case for her dismissal. The ad hoc committee, which is composed of fair, unbiased people, said that probation is the actual thing that should be done in response. And, no, they do not make a decision. A question about the process of the ad hoc committee, and maybe I should know this from the record and either don't or have just forgotten, but what kind of an input does the faculty have at the ad hoc committee stage? Because clearly we've got two things going on here. You've got the ad hoc committee. They make a recommendation. There's a decision made. And then there's this faculty meeting, which leads to a different determination. So were the faculty invited to comment to the ad hoc committee or no? No. Under the House Rules 13.0, the contract that they're under, it says that when there's probation or dismissal, this will be taken to a CCC committee. That committee will then recommend a disciplinary action. They recommend a dismissal. At that point, it says that the dean, they shall give her the opportunity to appeal to the ad hoc committee. It says shall. At that time, the board, Dr. Myler, Dr. Arthur, they present all of their evidence of why this person should be dismissed. At that time, the ad hoc committee makes a recommendation of probation, and it is the dean who then decides to accept it or not. We also have an email from Dr. Myler prior to the June 3rd meeting saying that, in his opinion, if you construe the facts in our favor, probation is the appropriate response. That's the district treatment here. But just so I understand, there's no procedure built into the ad hoc regime that permits or provides for faculty input. No, there is not. And there's also nothing built into the procedure that put Dr. Williams on notice that there could be a separate committee meeting of faculty where she is not invited and she doesn't get the opportunity to respond. That meeting, we say, is suspect. And the timing, they only had the meeting because they realized that there was no ability to appeal that decision. This is the first time they've ever done anything like this. That's why we believe that if you look at this evidence completely in its record, it is because she challenged the goodwill of this department by filing that sex and disability discrimination claim. And she had a reasonable belief to do that because she was being put forth through all of these different tests simply because she was a victim of sexual assault. And you can find that in their own critical grid report, and you can find it in the RIO report of investigation. Very well. Right on the number. Thank you so much. That case is submitted and court is adjourned.